

**UNITED STATES DISTRICT COURT**

**FOR THE CENTRAL DISTRICT OF CALIFORNIA**

**RAMON RIVERA,**

**Plaintiff,**

**v.**

**KENNETH E. MELSON, Acting Director, Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF); JOHN A. TORRES; Special Agent in Charge, ATF Los Angeles Field Division; ERIC H. HOLDER, United States Attorney General,**

**Defendants.**

**CASE NO. CV 09-2435 DOC (JCx)**

**<u>O R D E R</u> GRANTING MOTION FOR SUMMARY JUDGMENT**

Before the Court is Plaintiff Ramon Rivera's ("Rivera") Motion for Summary Judgment (the "Motion"). After considering the moving, opposing, and replying papers, as well as the parties' oral argument, the Court GRANTS the Motion.

**I. Background**

The Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961, *et seq.*, makes it illegal to participate in the conduct of an enterprise's affairs through a pattern of racketeering activity. 18 U.S.C. § 1962(c). The Act's purposes include the extrication of criminal elements from legitimate enterprises like corporations, unions, and government

institutions. To ensure that the wrongdoer does not continue to exercise control over the enterprise, and enjoy the ill-gotten gains from the racketeering activity, the Act provides for the forfeiture of illegal proceeds. 18 U.S.C. § 1963. In this lawsuit, an unindicted member of the Mongols Motorcycle Club challenges the government's attempt to regulate the use of trademarks that are arguably subject to forfeiture in a parallel criminal action.

On October 9, 2008, the government filed an Indictment against 22 purported members of the Mongols Motorcycle Group (the "Mongols"), including the Group's elected President, Ruben Cavazos ("Cavazos"). The eight-six count Indictment alleged that the 22 alleged Mongols members, acting individually and as members of a conspiracy, participated in the conduct of an enterprise's affairs through a pattern of racketeering activity in violation the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962(c) & (d). *Id.*

Count 85 of the Indictment alleged that Defendants' proceeds from the unlawful activity included a right or interest in two registered trademarks subject to forfeiture pursuant to 18 U.S.C. § 1963(a). The first trademark (the "Mongols mark") concerns the following image:




*See* Ex. B to the Declaration of Steven Welk (Dkt. 21-6).

The Mongols mark is traditionally stitched on a patch affixed to leather jackets and other articles of clothing donned by high-ranking members of the Mongols organization. In addition to displaying the Mongols mark, the patch identifies the wearer's state of residence and contains the following image; also the subject of a registered trademark (hereinafter the "Image mark"):



Ex. E to the Declaration of Steven Welk (Dkt. 33-6).

"Full patched" Mongols are authorized to wear articles of clothing with the patch that consists of the Mongols mark, the Image mark, and the member's state of residence. A Mongol obtains this privilege by surviving a challenging membership process that often requires several years of dedication to other Mongols, including the potential commission of illegal acts involving narcotics, firearms, and violence. *See* Ex. D to Welk Decl. ¶¶ 6-26.[1] If a full patched Mongol falls out of good standing with the Mongol organization, he is required to surrender all patches and/or articles of clothing from which the patch is inseparable, and also cover any tattoos that display the Mongol mark and/or the Image mark. *Id.* ¶ 35. Failure to do so may result in the "forcible" seizure of such items by members of the Mongols leadership, who claim to exercise control over the patch's use pursuant to the Mongol Nation's rights in the registered Mongol mark and Image mark. *Id.*; *see* Dkt. 21-6; *see also* Dkt. 33-6.[2]

The Mongols mark was registered with the United States Patent and Trademark Office (USPTO) on January 11, 2005, bears Registration Number 2,916,965, and was designated "for [] association services, namely, promoting the interests of persons interested in the recreation of riding." *See* Dkt. 21-6. The Image mark was registered on April 4, 2006, bears Registration Number 3,076,731, and was designated for commercial use "for [] jackets and t-shirts." *See* Dkt. 33-6. Both marks were registered by "Mongol Nation (California Unincorporated Association)," and Cavazos (the group's President) signed the applications.

---

[1] A full patched Mongol may find himself involved in acts of violence because the patch tends to instigate members of rival gangs, like the Hells Angels. *See id.* ¶ 9 (discussing long running violent feud between Mongols and Hells Angels over use of the "bottom patch").

[2] The Mongols' leadership also confronts members of other gangs who are spotted wearing the Mongols' marks: "if a motorcycle group decided to call itself 'Mongols,' and wear a completely different logo in a completely different territory, the actual Mongols would seek to shut down that group, forcibly removing their patches." Ex. D to Welk Decl. ¶ 37. The Mongols also occasionally issue "Code 55" orders to group members instructing them not to wear the "full patch" in exigent situations when anonymity is necessary — *e.g.*, when under police surveillance. *See id.* ¶ 38.

On April 4, 2008, Mongol Nation assigned its interest in both the Mongol mark and the Image mark to a company named Shotgun Productions, LLC ("Shotgun") that Cavazos had founded just months earlier, on February 7, 2008. *See* Ex. J. to Welk Decl.; Ex. H to Welk Decl. Approximately eight months later, on January 22, 2009, Mongol Nation *again* assigned all interest in the Mongols mark and the Image mark to a newly incorporated entity called Mongol Nation Motorcycle Club, Inc. ("MMC"). *See* Ex. J to Welk Decl.; Ex. L to Welk Decl. This second assignment was effectuated after the Indictment against Cavazos had been filed.

On October 17, 2008, a little more than one week after the Indictment was filed, the government applied *ex parte* for a post-indictment restraining order to (1) proscribe subsequent sale of the Mongols mark; and (2) enjoin use or display of the Mongols mark by defendants and "and those acting on their behalf or in concert with them." CR 08-1201, Dkt. 248. The district court granted the government's request on October 21, 2008, but struck language in the government's proposed order that would have enjoined defendants (and their associates) from "wearing, using or displaying" the Mongols mark. *See* CR 08-1201 Dkt. 249. The post-indictment restraining order nevertheless ordered defendants (and their associates) to "surrender for seizure" articles of clothing, products, motorcycles, books, and other items that bore the Mongols mark. *Id.* One day later, the government applied *ex parte* for an amended post-indictment restraining order that clarified its authority to seize such items, and the district court granted the proposed amended order on October 22, 2008. Dkt. 235.

Rivera is an unindicted full patched Mongol in good standing with the San Diego chapter of the Mongols organization. Like many Mongols, Rivera enjoys riding motorcycles, but also relishes other aspects of membership, including "participat[ion] in social and charitable events organized by the [Mongols] and its chapters in the San Diego area." Rivera Decl. ¶ 6. When he attends these charitable events in the San Diego area, Rivera prefers to wear articles of clothing that signal his membership in the Mongols. *See id.* ¶¶ 4-5. He is often found wearing this clothing in his daily life as well, in order to express allegiance with Mongol members, who are predominantly "low-income and Latino" males who seek "recognition and equality." *Id.* ¶ 5.

Rivera claims that three incidents after the October 22, 2008 post-indictment restraining

order caused him to develop a well-founded fear that government officials will seize his vests, shirts, and hats that display the Mongols mark. Rivera Decl. ¶ 13. First, on January 10, 2009, Rivera allegedly witnessed an agent with the Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF) "confiscate a shirt displaying the [mark] . . . from a supporter of the Club who is not named as a defendant" in the criminal action. *Id.* ¶ 9. Second, at a funeral of a fellow Mongol in January 2009, Rivera allegedly witnessed a police officer with the Montebello Police Department "confiscate clothing displaying" the mark. *Id.* ¶ 10. At a February 15, 2009 funeral, Rivera was allegedly informed by an officer with the National City Police Department that "if agents saw anyone wearing items displaying the [marks], the agents would ask National City Police Department officers to confiscate those items." *Id.* ¶ 11.

Rivera filed the instant action on March 10, 2009 in the United States District Court for the Southern District of California seeking a permanent injunction that restrains the government from seizing his articles of clothing that bear the Mongols mark and/or the Image mark. On July 31, 2009, the district court granted Rivera's application for a Preliminary Injunction, noting that Rivera had been chilled from exercising his First Amendment right to display the marks and associate with his fellow Mongols. Dkt. 1. Rivera now moves for summary judgment.

**II. Legal Standard**

Summary judgment is proper if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In determining whether to grant summary judgment, the Court must view the facts and draw inferences in the manner most favorable to the non-moving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S. Ct. 993 (1962); *Chevron Corp. v. Pennzoil Co.*, 974 F.2d 1156, 1161 (9th Cir. 1992). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256, 106 S. Ct. 2505 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25, 106 S. Ct. 2548 (1986). When the non-moving party bears the burden of proving the claim or defense, the moving party can meet its burden by pointing out that the non-moving party has failed to present any genuine issue of

material fact. *Musick v. Burke*, 913 F.2d 1390, 1394 (9th Cir. 1990).

## III. Discussion

Rivera seeks a judicial declaration that "Defendants may not seize or ask or direct any other person or entity to seize any item or property from Plaintiff that bears" the Mongols mark and/or Image mark. First Am. Compl., at 11. Rivera argues that Defendants lack the statutory authority to seize from him, either directly or indirectly, any item that bears the Mongols mark and/or Image mark. Rivera also argues that such seizure would violate the due process clause of the Fifth Amendment, the First Amendment, and Fed. R. Civ. P. 65.

### A. Due Process

The seizure of items bearing the marks should be preceded by Constitutional due process. U.S. Const. Amend. V. The government operates under the theory that, by obtaining any rights in the marks, it has achieved the ability to seize without prior notice any infringing uses of the mark. The government is not free to make its own determinations about whether Rivera has committed infringement by wearing articles of clothing that bear the marks; that finding must be made in an adversary proceeding. *See* 15 U.S.C. § 1118. In this case, the government argues that due process requirements were satisfied by the district court's determination in the parallel criminal action that the Mongols trademark is subject to forfeiture. This argument is in error for the reasons discussed below. Specifically, the trademark rights were not subject to forfeiture, and, even they were, the property that bears the trademarked image is distinct from the trademark itself.

### B. First Amendment

The undisputed facts establish that the government's seizure of items bearing the Mongols mark and/or Image mark also would violate Rivera's rights under the First Amendment to the United States Constitution.[3]

In addition to protecting speech, the First Amendment protects conduct "imbued with

[3] The First Amendment protects both expressive and associational conduct. Rivera has not clearly distinguished between the two in his briefing.

elements of communication." *Spence v. Washington*, 418 U.S. 405, 409, 94 S.Ct. 2727 (1974). Displaying a symbol on one's person or clothing constitutes protected communicative conduct if (1) the symbol is "intended to convey a particularized message"; and (2) "in the surrounding circumstances the likelihood was great that the message would be understood by those who viewed it." *Id.* at 410-11. For example, a symbol that unequivocally conveys a political message, like a campaign button or the American flag, enjoys constitutional protection. *Id.*; *see also Bd. of Airport Com'rs of City of Los Angeles v. Jews for Jesus, Inc.*, 482 U.S. 569, 576, 107 S.Ct. 2568 (1987). Clothing can also express membership in an association. *See Church of American Knights of the Ku Klux Klan v. Kerik*, 356 F.3d 197, 206 (2d Cir. 2004) ("[T]he regalia of the American Knights . . . are expressive; they are expressive in the way that wearing a uniform is expressive, identifying the wearer with other wearers of the same uniform, and with the ideology or purpose of the group.").

Although the government and Rivera dispute the substance of the message conveyed by the Mongols mark and Image mark, it is undisputed that both marks convey a message. Rivera claims that he wears articles of clothing that bear the Mongols mark and/or Image mark in order to express his allegiance to fellow low-income Latino males with an affinity for riding motorcycles. The government responds that Rivera's display of either or both marks expresses his allegiance to a "criminal organization" committed to engaging in violent acts. Whatever the message, the Ninth Circuit has observed that patches and symbols signifying membership in a motorcycle organization communicates "the fact of [members'] association with this particular kind of organization." *Sammartano v. First Judicial District Court*, 303 F.3d 959, 972 (9th Cir. 2002). The government concedes, and even relies upon, the existence of this communicative effect by arguing that message conveyed by the marks is worthy of suppression.[4]

---

[4] In *Church of American Knights of the Ku Klux Klan v. Kerik*, 356 F.3d 197 (2d Cir. 2004), the Second Circuit held that, to qualify as "expressive" conduct protected by the First Amendment, the symbol or article of clothing must "convey a message independently of" other symbols or articles of clothing associated with the prohibited article. *Id.* at 206. In that case, the court held that the mask traditionally worn by members of the Ku Klux Klan did not convey a message independently of "the robe and

Seizures of expressive materials are prior restraints on speech. *See Alexander v. United States*, 509 U.S. 544, 550, 113 S.Ct. 2766 (1993) ("Temporary restraining orders and permanent injunctions — *i.e.*, court orders that actually forbid speech activities — are classic examples of prior restraints."). Restrictions aimed at suppressing the "substantive message [] convey[ed]" by a particular symbol generally run afoul of the First Amendment, *Cohen v. California*, 403 U.S. 15, 19, 91 S.Ct. 1780 (1971), and are generally permissible only if they are (1) reasonable in light of the forum's purpose and (2) viewpoint neutral. *See Cornelius v. NAACP Legal Defense & Educ. Fund*, 473 U.S. 788, 806, 105 S.Ct. 3439 (1985).

The government claims that its restrictions are warranted on two grounds. First, the government contends that the materials seized (the patches) constitute "assets that were found to be related to" the alleged acts of racketeering. *Alexander*, 509 U.S. at 551 (holding that First Amendment does not prohibit seizure of expressive materials pursuant to RICO's forfeiture provisions). Second, the government argues that, by virtue of the post-conviction forfeiture entered by the district court in the parallel criminal action, it has obtained the intellectual property rights previously held by the Mongols, and that such rights encompass the right to exclude individuals from using the registered Mongols mark and Image mark. *Cf., Dr. Seuss Enters., L.P. v. Penguin Books USA, Inc.*, 109 F.3d 1394, 1403 n. 11 (9th Cir. 1997) ("Trademark protection is not lost simply because the allegedly infringing use is in connection with a work of artistic expression."). For the reasons discussed below, neither of the government's explanations are convincing.

**C. Statutory Authority to Seize Items Bearing the Marks**

The post-indictment restraining order, which ordered defendants' unindicted associates to "surrender" items bearing the "MONGOLS" mark, was "erroneously issued" and "beyond the jurisdiction of the court." *See United States v. United Mine Workers of Am.*, 330 U.S. 258, 295,

---

the hood" that accompanied the mask. *Id.* Here, by contrast, Mongols mark and Image mark are the only two symbols displayed on the patch worn by full patched Mongols. They are undisputedly the only recognized means of expressing membership in the Mongols organization.

67 S.Ct. 677 (1947). As Judge Cooper herself acknowledged in granting the preliminary injunction this civil action, the government's enforcement of the post-indictment amended order issued in the criminal matter must be enjoined as to Rivera. Collateral proceedings — such as this one — may be used to remedy the harm caused by the wrongfully issued preliminary injunction in the criminal matter. *Cf., N.L.R.B. v. Local 282, Intern. Broth. of Teamsters*, 428 F.2d 994, 999 (2d Cir. 1970).

The post-indictment restraining order issued pursuant to 18 U.S.C. § 1963(d), which covers *in personam* forfeitures under RICO. Section 1963(d) permits the court to "enter a restraining order or injunction . . . to preserve the availability of property . . . for forfeiture under this section." 18 U.S.C. § 1963(d). Forfeitable property includes the indicted defendant's (1) property interests obtained as a result of his section 1962 violation; (2) interests, security, claims, property, and/or contractual rights over any enterprise; and (3) property that constitutes or was derived from proceeds the indicted defendant obtained as a result of his violation of section 1962. *See* 18 U.S.C. § 1963(a). The October 22, 2008 amended post-indictment restraining order in the criminal action concluded that the "MONGOLS" "trademark would be subject to forfeiture to the United States under 18 U.S.C. § 1963(a)(1), (2) and (3)." Dkt. 235 at 2. On the basis on this conclusion, the order directed defendants, as well as their "agents, servants, employees, family members, and those persons in active concert or participation with them, [to] surrender for seizure all products, clothing, vehicles, motorcycles, books, posters, merchandise, stationery, or other materials bearing the Mongols trademark, upon presentation of a copy of this order." *Id.*, at 3.

The post-indictment restraint sought by the government was erroneous because (1) wearing the mark did not prevent its availability for forfeiture; and (2) the mark was not subject to forfeiture anyway.

**1. Availability**

First, a trademark is distinct from property (like clothing, books, and motorcycles) that bears the trademark. *See In re N.C.P. Marketing Group, Inc.*, 337 B.R. 230, 236 (D. Nev. 2005) ("Trademark rights are intangible property rights because their primary feature and value are

consumers' perceptions of the mark."). Defendants in the criminal action lacked any property right or interest in the leather patches sewn on to the articles of clothing worn by unindicted Mongols. They also lacked a property interest in the articles of clothing themselves, which remained in the possession of unindicted third party members of the Mongols. Property belonging to a third party is only forfeitable under RICO if it originally belonged to the RICO-defendant. *See United States v. Pelullo*, 178 F.3d 196, 201 (3d Cir. 1999). The leather patches, and the items bearing those patches, were not subject to forfeiture.

Second, post-indictment restraint on the mark's use was unnecessary to preserve the availability of the mark for eventual forfeiture. Section 1963(d) permits the court to take any "action to preserve the ***availability***" of forfeitable property. *See* 18 U.S.C. § 1963(d) (emphasis added). Restraints imposed pursuant to section 1963(d) must *preserve* the status quo. *See State of Indiana ex rel. Zoeller v. Pastrick*, 696 F. Supp. 2d 970, 993-94 (N.D. Ind. 2010) (citing *United States v. Regan*, 858 F.2d 115, 119-20 (2d Cir. 1988)). "Taking the jackets off" Mongols members backs does not preserve the status quo; it effectuates a fundamental change in the way membership is expressed. It also does not preserve the availability of the trademarks for eventual forfeiture, as the defendant's purported right in the mark is separate and distinct from the property that bears the mark. *See N.C.P. Marketing Group, Inc.*, 337 B.R. at 236.

The government responds that the post-indictment restraint on the mark's use in connection with "violence, murder and drug trafficking" preserved the mark's value. However, the amended order required *all* family members and associates to surrender the leather patches — not just individuals engaged in criminal activity. Furthermore, section 1963(d) only discusses restraints that preserve "availability," not "value" of the forfeitable property. Even if the statute allowed restraints intended to preserve the "value" of the forfeitable property, forcing Mongols to surrender clothing bearing the mark would have *diminished* the mark's value, which derived value from aspiring Mongols' willingness to do "whatever it takes, including a wide variety of illegal activities," to become a full patched member. *See* Ex. D to Welk Decl. ¶ 17. The purpose of a collective mark is to allow an organization's members to "indicat[e] membership" to the broader public. *See* 15 U.S.C. § 1127. Preventing Mongols from wearing a leather patch

bearing the word "MONGOLS" eviscerates the mark's purpose of signifying membership. *See International Order of Job's Daughters v. Lindeburg & Co.*, 633 F.2d 912, 917-20 (9th Cir. 1980) (holding that collective mark's use may not be enjoined where it does not confuse the public about membership in the group); *see generally United Drug v. Theodore Rectanus Co.*, 248 U.S. 90, 97-98 (1918) ("The owner of a trademark may not, like the proprietor of a patented invention, make a negative and merely prohibitive use of it as a monopoly.").

The government offered a third theory in support of the post-indictment restraining order. In its *ex parte* application in the criminal action, the government argued that the mark had been obtained a result of the Mongols' "fraudulent[] represent[ation] to the [USPTO] that the trademark would be used to exploit the recreational activity of motorcycle riding." The government contended that the Mongols actually contemplated that the mark would be used "to exploit [the Mongols'] criminal enterprise." The government cited *Marshak v. Treadwell* for the proposition that use of a fraudulently obtained trademark may be enjoined. However, it is black letter law that a fraudulently obtained trademark is cancelled, thereby allowing its unrestricted use in the public domain. *See In re Bose Corp.*, 580 F.3d 1240, 1243 (Fed. Cir. 2009). The registration for the mark at issue in *Marshak* may have been fraudulently obtained, but the court only restricted the registrant's use of the mark because there was an *existing* common law right to the mark, which is not the case here. *See* 240 F.3d 184, 187 (3d Cir. 2001). Thus, the government's argument in its *ex parte* application collapsed on itself: if the mark had been fraudulently obtained by the Mongols, then no member of the public, including members of Mongols, could be restrained from wearing items of clothing bearing the mark.

The government finally expressed concern that the mark would be used in connection with future violations of the RICO statute. However, the indictment only charged defendants; it did not also charge their family members and associates. Long standing First Amendment jurisprudence precludes the government from restricting expression absent "a judicial determination that the speech is harmful, unprotected, or otherwise illegal." *See* Preliminary Injunction Order at 21 (citing *Adult Video Ass'n v. Barr*, 960 F.2d 781, 788 (9th Cir. 1992)). As Judge Cooper properly observed in the preliminary injunction order, "[n]o such determination

was ever sought by the [g]overnment, and no such determination was ever made by the Court." *Id.* at 22. Predicating the post-indictment restraining order on a hypothetical concern about the mark's use in connection with illegal conduct would have effectuated an overbroad and unconstitutional restriction on unindicted individuals' freedom of expression.

**2. Forfeitability**

A post-indictment restraint must also attempt to preserve the availability of "property described in subsection (a) for forfeiture." 18 U.S.C. § 1963(d). Such property includes "any . . . interest in; security of; claim against; or property or contractual right of any kind affording a source of influence over; any enterprise which" the defendant has established, operated, controlled, conducted, or participated in the conduct of." 18 U.S.C. § 1963(a). Prior to imposing a post-indictment restraint, the district court must make "specific findings permitting an appellate court to determine whether the property restrained is subject to forfeiture." *See United States v. Riley*, 78 F.3d 367, 370 (8th Cir. 1996) (describing post-indictment restraint as "extreme measure" that must be issued with caution). The district court failed to make such specific findings and, even if it had, those findings would have been in error.

As discussed in great detail by the preliminary injunction order, RICO forfeiture is an *in personam* action rather than an *in rem* action. *United States v. Angiulo,* 897 F.2d 1169, 1210 (1st Cir. 1990) ("RICO forfeiture, unlike forfeiture under other statutes 'is a sanction against the individual rather than a judgment against the property itself.'"); *see also United States v. Nava*, 404 F.3d 1119, 1124 (9th Cir. 2005) (discussing *in personam* nature of the criminal forfeiture statutes, 18 U.S.C. § 1963 and 21 U.S.C. § 853). "[O]nly the property of the defendant (including property held by a third party pursuant to a voidable transaction) can be confiscated." *United States v. BCCI Holdings (Luxenbourg), S.A.*, 46 F.3d 1185, 1190 (D.C. Cir. 1995). Because none of the defendants, including Cavazos, had a forfeitable interest in the "MONGOLS" mark, the post-indictment restraint on the mark was invalid.

A collective mark, like the "MONGOLS" mark, must be owned by the "organization as is indicated by the statutory definition." *F.R. Lepage Bakery, Inc. v. Roush Bakery Prods. Co., Inc.*, 851 F.2d 351, 353 (Fed. Cir. 1988), *modified on other grounds*, 863 F.2d 43 (Fed. Cir.

1988). In this case, the Mongols owned the mark and retained rights to its use. Its rights to the mark were "property of the unincorporated association and not of the members individually." Cal. Corp. Code § 18110. The individual defendants charged in the criminal indictment therefore lacked any forfeitable ownership interest in the "MONGOLS" mark.

Nor did the defendants have any other forfeitable interest in the mark. The government argued in its *ex parte* application that the Mongols' unincorporated association assigned its rights to the mark to Shotgun Products, LLC, an entity under Cavazos' sole control. The preliminary injunction properly rejected that argument. Any right or interest in a trademark must be "appurtenant to an established business or trade in connection with which the mark is employed." *United Drug Co. v. Theodore Roosevelt Co.*, 248 U.S. 90 (1918). Thus, "a trademark cannot be sold or assigned apart from [the] goodwill it symbolizes[.] There are no rights in a trademark apart from the business with which the mark has been associated; they are inseparable." *Marshak v. Green*, 746 F.2d 927, 929 (2d Cir. 1984) (internal citation omitted). Since Cavazos' entity, Shotgun Productions, LLC, never "used the mark . . . to indicate membership in an organization substantially similar to that of the Mongols Nation," the "[p]urported assignment to Shotgun Productions, LLC [was] without legal effect." Order at 13.

**IV. Disposition**

The government's theory in this case is creative to a fault. The marks are a collective use mark, the rights to which could not have been assigned in gross to the entity controlled by Cavazos. Even if Cavazos had an enforceable interest in the marks, that right was not forfeitable to the government. And even if Cavazos had a forfeitable interest in the marks, Rivera's use of clothing bearing the marks did not diminish the marks' availability for forfeiture. The government argues that it should be allowed to engage in the very tactics it repudiates, by forcing the "surrender" of Mongols' patches and even "forcibly remov[ing] the[] patches" of Mongols who fail to comply with ATF's directive. *See* Ex. D to Welk Decl. ¶¶ 36-37. However, neither the Mongols nor the government have the right to say "It is our trademark; we

///

///

have a right to choose who uses it, even if we do so arbitrarily and vindictively, and the court must lend a hand." *U.S. Jaycees v. Cedar Rapids Jaycees*, 794 F.2d 379, 383 (Fed. Cir. 1997).

Rivera's Motion is GRANTED.

IT IS SO ORDERED.

DATED: January 4, 2011

David O. Carter

DAVID O. CARTER
United States District Judge